**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>$361,225.00 in U.S. Currency;<br><br>$64,947.57 in funds seized from KeyBank Account numbers ending in 7504, 3018, 2407;<br><br>$65,319.06 in funds seized from Bank of America Account number 8255;<br><br>$37,107.59 in funds seized from TD Bank Account number ending 3438; and<br><br>$312,906.40 in funds seized in place in Edward Jones Investment Accounts ending 8319, 8210, and 9214.<br><br>Defendants. | Civil Action No.: 1:25-CV-0503 (LEK/PJE) |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, John A. Sarcone III, United States Attorney for the Northern District of New York, and Elizabeth Conger, Assistant United States Attorney, brings this verified complaint for forfeiture *in rem* against the above-captioned property (the "Defendant Property") and alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, Title 18, United States Code, Section 981(a)(1) and Title 31, United States Code, Section 5317(c)(2).

## THE PARTIES

1.     The Plaintiff is the United States of America.

2.     The Defendant Property consists of the following:

1

     a.  $361,225.00 in U.S. Currency;

     b.  $21,657.43 in funds seized from KeyBank Account number 7504, held in the name of David Longstaff and Ying Han;

     c.  $40,499.08 in funds seized from KeyBank Account number 3018, held in the name of David Longstaff and Ying Han;

     d.  $2,791.06 in funds seized from KeyBank Account number 2407, held in the name of David Longstaff and Janet Longstaff;

     e.  $65,319.06 in funds seized from Bank of America Account number 8255;

     f.  $37,107.59 in funds seized from TD Bank Account number ending 3438; and

     g.  $312,906.40 in funds seized in place in the following Edward Jones Investment Accounts:

          i.  $80,750.88 held in place in Edward Jones account ending 8319;

          ii.  $69,749.50 held in place in Edward Jones account ending 8210; and

          iii.  $162,406.02 held in place in Edward Jones account ending 9214.

3.     All of the Defendant Property, except for the Edward Jones investment accounts, have been seized and taken into federal custody.

4.     The Edward Jones investment accounts are presently "seized in place" by Edward Jones for the preservation of these funds during the pendency of this civil forfeiture action.

**BASIS FOR FORFEITURE**

5.     This action *in rem* is brought pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C) as the proceeds of, and property involved in, violations of Title 18, United States Code, Sections 1952(b) (promotion of prostitution), 1956(a) (money laundering), 1956(h) (conspiracy to commit money laundering), and 1957(a) (engaging in monetary transactions in property derived from specified unlawful activity), and pursuant to Title 31, United States Code,

Section 5317(c)(2)(A) as property involved in offenses in violation of Title 31, United States Code, Section 5324 (structuring transactions to evade reporting requirements).

6.    This action is also brought pursuant to Rule G of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rule G").

7.    Title 18, United States Code, Section 981(a)(1)(A) provides for the forfeiture of: "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of [Title 18], or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A).

8.    Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of: "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of … any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C).

9.    Title 31, United States Code, Section 5317(c)(2)(A) provides for the forfeiture of: "[a]ny property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any violation, and property traceable to any such violation or conspiracy." 31 U.S.C. § 5317(c)(2)(A).

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

11.    Section 1345 provides district courts with "original jurisdiction of all civil actions, suits or proceedings commenced by the United States." 28 U.S.C. § 1345.

12.    Section 1355(a) provides district courts with "original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine,

penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress." 28 U.S.C. § 1355(a).

13.     This Court has *in rem* jurisdiction over the Defendant Property and venue is properly situated in this district pursuant to Title 28, United States Code, Section 1355(b), which provides that a forfeiture action or proceeding "may be brought in . . . the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A).

## **FACTS**

14.     Beginning in or about May of 2021, members of the United States Department of Homeland Security, ("DHS"), Homeland Security Investigations ("HSI"), and the New York State Police ("NYSP") began investigating Aroma Foot Spa ("Aroma") located at 1602 Route 9, Halfmoon, New York.

15.     During the investigation, law enforcement established probable cause to believe that the owners of Aroma, David Longstaff ("Longstaff") and his wife, Ying Z. Han ("Han"), hired employees to engage in acts of prostitution, advertised for commercial sex on the internet, financially benefitted from the prostitution, and laundered the proceeds – frequently through structured cash deposits into Longstaff's bank accounts.

16.     On August 27, 2020, Longstaff filed paperwork with the New York State Division of Corporations and State Records in which he listed himself as the registered agent for Aroma Foot Spa.

17.     During surveillance, members of law enforcement regularly observed Longstaff's wife, Han, at Aroma. She arrived and departed Aroma in a black Nissan Altima, which was also observed at the Longstaff/Han Residence.

<u>Surveillance and Customer Interviews</u>

18.    On May 12, 2021, law enforcement observed a man leave Aroma, get into his car and drive away.  NYSP stopped the vehicle for a violation of the vehicle and traffic law and interviewed the driver.

19.    He verified that he had paid $60 upfront in cash for a massage at Aroma.  He said that he was led into a massage room by a tall, thin Asian woman, and brought to a room where another woman was to perform the massage.

20.    He stated that he was at first laying on his stomach before he turned over on his back.  When he did the masseuse used her hand to make a gesture like masturbating a penis.  He said "yes" and then she masturbated his penis.

21.    When she was done, he gave her $20 in cash as a "tip."  She held up four fingers, indicating that she wanted $40, but he refused and left.

22.    On May 20, 2021, agents conducted surveillance in the parking lot adjacent to Aroma.  Agents observed another man, later identified, leave the business.

23.    On May 26, 2021, agents contacted the man identified on May 20, 2021 and he agreed to speak to them.

24.    He confirmed he was at Aroma on May 20, 2021, and stated that he had frequented Aroma and similar establishments on approximately 500 occasions.

25.    He advised that he had been to Aroma four times between February 2021 and May 26, 2021 and had seen both employees present at the spa on each occasion.

26.    He said Aroma employees offered him commercial sex services each time he visited the establishment.

27.     He explained that an employee would tap all over his back which meant that he should turn over to lay on his back instead of his stomach.  When he did, the employee would run her finger up his leg, stopping short of touching his penis.

28.     She would then nod at him and look to see if he was interested in her masturbating his penis.  He stated that on the last occasion he was at Aroma he told the employee "No" and requested that she massage his head instead.

<u>Review of Employment Records</u>

29.     On February 15, 2022, agents conducted an audit of Employment Eligibility Verification forms and supporting documentation ("I-9 audit") at Aroma.

30.     During the I-9 audit, Han was served and required to produce several pieces of documentation including a list of all employees, the date they were hired and/or terminated, and the payroll and business documentation.

31.     During surveillance of Aroma conducted on multiple occasions before and after February 15, 2022, HSI agents observed a young Asian female ("Individual One") present at Aroma before Han opened the spa and after Han closed the spa.

32.     Before Aroma opened each day, Individual One was observed removing a blanket placed over the window at the end of the prior day, and turning on the "Open" sign.

33.     Surveillance conducted by agents showed that Individual One worked at Aroma at times when Han was present, and at other times when Han was absent.

34.     On February 23, 2022, agents arrived at Aroma to pick up the documents that they had identified as documents needed for an I-9 employment authorization audit.

35.     Upon entering Aroma, HSI agents saw Han, Individual One, and another woman present in the establishment.

36.     At that time, Han produced only one I-9 form with Han's identifying information.

37.     When asked why she did not provide an I-9 form for any other employee or complete the questionnaire agents had provided her with on February 15, 2022, Han stated that she was the only employee.

38.     Han was advised that it was a crime to lie to a federal agent.

39.     On February 24, 2022, Longstaff confirmed to agents, by telephone, that Han was the only employee working at Aroma.

40.     He said that if there were any other women present at Aroma, they were just Han's friends.

41.     Longstaff added that Han may occasionally have others working at Aroma who only collected tips as payments.

42.     Agents advised Longstaff that employees who work for tips are also required to have an I-9.

43.     On March 1, 2022, an HSI agent conducted early surveillance of Aroma after telling Longstaff and Han that he would be back that day to collect their additional I-9 paperwork.  The agent observed the "Open" sign being turned on prior to Han's arrival at Aroma.

44.     Soon thereafter, Han arrived at Aroma.  Approximately thirteen minutes later, Individual One departed Aroma wearing a black coat and a leather backpack.  She walked to the entrance of the shopping plaza, and was picked up approximately seven minutes later and driven to a nail salon down the road.

45.     The agent then called Han and advised that he would not be arriving to pick up the documents as planned and would call to let her know when he arrived.

46. Roughly 47 minutes later, Individual One left the nail salon and walked back to Aroma, arriving 22 minutes later.

47. Later that day, the agent reinitiated surveillance of Aroma. He called Han and advised that he would be at Aroma between 4:00 p.m. and 4:15 p.m. to collect the additional I-9 paperwork. At the time the call was placed, the agent could see that there was a customer present at Aroma.

48. Shortly thereafter, at approximately 3:45 p.m., Individual One left Aroma at a brisk pace, ran towards the side parking lot of the business, and then out of sight.

49. At approximately 3:53 p.m., Longstaff arrived and entered Aroma.

50. At approximately 3:58 p.m., a customer was observed leaving Aroma and departing in a gray pick-up truck.

51. At approximately 4:25 p.m., the agent, newly joined by a second agent, observed the black Nissan Altima driven by Han and registered to Longstaff parked further away from Aroma than usual, on the side of another business in the same shopping plaza.

52. The two agents pulled next to the vehicle and observed Individual One laying down in the backseat of the black Nissan Altima.

53. The two agents drove away from the black Nissan Altima, parked, and entered Aroma.

54. The interior lights were off when the agents entered, and Longstaff and Han were in the lobby area.

55. Han told one agent that she had been in the United States for over ten years, and was married to Longstaff. She stated that she opened Aroma because she wanted to work after her two children started school.

56.     Han said that she was the only employee of Aroma and did not have help.  She added that she chose how many clients she wanted to see daily and kept a schedule.

57.     Longstaff stated that he was the business owner and provided the agents with the additional documentation requested in the I-9 inspection, in addition to other documentation, including the following: (1) the Notice of Inspection; (2) the Business Entity Questionnaire; (3) responses to Notice of Inspection Attachment A; (4) a New York Department of State ("DOS") business license for Aroma Foot Spa and a DOS Division of Corporations printout showing the registered agent as David B. Longstaff; (5) a DOS Online Filing Receipt filed by previous owner; (6) a Certificate of Incorporation filed by previous owner; (7) documents identifying Longstaff as the new owner; and (8) and a Town of Halfmoon fire inspection compliance certificate.

58.     Longstaff said that Han was the only employee at that time, but added that she would occasionally have another person come in and work for tips if they needed help.  He said that he would use the I-9 to verify that anyone working for Aroma was authorized to work in the United States.

59.     Longstaff added that Han received assistance from one or two people occasionally, contradicting Han's statement that she was the sole employee and did not have help.

60.     When asked if he knew names of the other employees, Longstaff said that he did not but said that Han had someone coming in in two days and said that he would have that person fill out an I-9.  Longstaff added that Han had talked to this person and said that the person had a permanent residence card and a social security card.

61.     The agents left Aroma, drove out of the parking lot, and then returned to the shopping plaza across the street.  One agent kept surveillance of the black Nissan Altima, while another returned to the lot near Aroma to conduct surveillance of the business.

62.    At approximately 4:46 p.m., Individual One was observed exiting the back seat of the black Nissan Altima in a black jacket, while carrying a backpack.  She was then observed walking towards Aroma.

63.    At approximately 4:47 p.m., NYSP conducted a welfare check on Individual One. A New York State Trooper entered the spa, departing at 5:04 p.m.

64.    The trooper advised that Han told her that she was the person in the car and claimed that no one else was present in the business.

Online Advertisement

65.    On January 19, 2023, agents identified an advertisement on an adult website, "Adultlook.com," advertising a "New Hot Girl H."  *See* Attachment A.  The advertisement, had six pictures of a young Asian woman, provided Aroma's address, a telephone number, and stated that the establishment is located "[b]ehind computer shop."  *Id.*

66.    The advertisement provided a description that read: "NEW SEXY GIRLS ARRIVED … Don't Miss IT !"  Below this description it stated: "30minutes, $45 … 60minutes.$60," and identified the hours as "9.00am-9.30pm  (Open 7 Days)."  *Id.*

67.    The advertisement further stated that the establishment offered "Young & Hot Beautiful Asian Girls."  *Id.*

68.    On March 2, 2023, HSI agents again surveilled Aroma.

69.    Between 2:44 p.m. and 3:38 p.m. that day, the agents observed five men come and go from Aroma.

70.    At 3:00 p.m., an agent called Longstaff who told him to call back in an hour.  At 4:11 p.m., the agent called Longstaff again, but the call was not answered.  Another call placed at 4:24 p.m. went to voicemail.  Soon thereafter, the agent received a call from a caller who identified

herself as Han.  The agent told Han that he would be at Aroma in approximately ten minutes to drop off I-9 paperwork.

71.    At 4:27 p.m., an Asian woman, not believed to be Individual One, left Aroma, walked to the rear of the building, and entered the black Nissan Altima.  One of the five men earlier observed by the agents was seen leaving Aroma approximately 30 seconds after the woman left Aroma.

72.    Five minutes later, the agents entered Aroma and Han was present.  Han called Longstaff so that he could listen to their conversation.  An agent told Han and Longstaff that they were receiving a warning and reviewed the warning letter with them.

73.    Longstaff stated that he had not yet needed to fill out any I-9's and said that he and Han were the only employees.

74.    Han stated that other people had worked at Aroma Foot Spa, but only stayed for a day or two because they did not make money.  She said that the last time that she had someone "helping" her was in December 2022, but said that the person stayed only two days.

75.    Han claimed that she had four customers that day.

76.    After the agents left Aroma, they saw Han leave the business with papers in her hand.  She walked past the black Nissan Altima, looked around, went to the passenger side, and appeared to be speaking with the woman.  At 5:17 p.m., the unidentified Asian woman got out of the black Nissan Altima and entered Aroma.

77.     The agents interviewed the man who left Aroma shortly after the Asian woman who had left Aroma and entered the black Nissan Altima.

78.    The man admitted to receiving a sexual service for a $100 tip in addition to $60 for a massage, and stated that he paid entirely in cash.

Execution of the Federal Search Warrants

79.     On May 8, 2023, agents executed search warrants at the Longstaff/Han Residence and at Aroma.

80.     During a search of the Longstaff/Han Residence, the defendant $361,225.00 in U.S. Currency was seized from the home.

81.     Agents also located documents showing large wire transfers among various accounts.

82.     When interviewed after the execution of the search warrants, Han admitted that Aroma had an employee, ("Individual Two").

83.     Han said that Individual Two had provided a social security card, an Employment Authorization card, and a New York State license when hired; however, agents identified Individual Two as a Chinese national.

84.     Han denied any sexual activity taking place at Aroma and said that only foot massages were performed.

85.     When Han was told that multiple customers had said that they had received sexual services from Han at Aroma, she responded that she may have inadvertently touched customers' genitalia at some point.

86.     Han stated that Individual Two worked from open to close at Aroma with no days off, slept in a breakroom at Aroma, performed only foot massages, and paid Han $10 per day for food.

87.     During the search of Aroma later that same day, HSI agents found Individual Two in a massage room with a client who was not wearing clothing.

88.     Individual Two stated that she worked 12-hour days, seven days a week, was not paid an hourly wage, did not have scheduled days off, did not earn overtime or bonuses, and was required to pay $10 per day to sleep in one of the rooms at the spa.

89.     She stated that she learned about Aroma through a website advertisement.

90.     She further advised that she had previously worked at a massage parlor in Connecticut.

91.     Individual Two said that Han had originally told her that Aroma was a legitimate foot massage parlor.  However, after she had started working there, she said that Han told her that she had to allow the customers to masturbate while she provided erotic massages.

92.     Individual Two further stated that she performed approximately six massages per day, costing customers $60 per hour.  She stated that of the $60, Aroma kept $40, and she kept $20.  She said that in three months working at Aroma she made approximately $14,000.

93.     That same day, law enforcement interviewed Longstaff at the Saratoga County Sheriff's Office sub-station in Halfmoon, New York.  Longstaff was advised that he was not under arrest, had no obligation to speak with law enforcement, and could leave at any time.

94.     Longstaff stated that he would tell the investigators anything that they wanted to know.

95.     Longstaff stated that he owned Aroma Spa, and said that Han gave him cash from payments for foot massages at Aroma.

96.     He stated further that he deposited the cash into his personal checking accounts.

97.     Records show that Longstaff deposited his earnings from his employment with Simmons Machine Tool Corporation into the same accounts.

98.    He stated that he makes approximately $100,000 to $140,000 annually from that employment.

99.    Longstaff admitted that he comingled the funds from his employment with the cash deposits from Aroma.

100.    He stated that the funds from the commingled accounts were then transferred to Edward Jones investment accounts in increments less than $10,000.

101.    During the interview, the agent asked Longstaff why he chose deposit amounts of approximately $7,500.  Longstaff responded that it was because it was less than $10,000.

102.    The agent explained structuring to Longstaff, and Longstaff acknowledged that he structured his cash deposits to avoid reporting requirements.

103.    Longstaff said that the only credit card transactions that occurred at Aroma were deposited into Aroma's business account.

104.    He said that he did not pay sales tax for services rendered at Aroma, did not have a license to operate a massage business in New York State, and reported only roughly three-quarters of the income received from Aroma for income tax purposes.

105.    He estimated that Aroma generated approximately $70,000 to $90,000 per year, not including cash tips.

106.    Longstaff stated that they paid $1,400 per month for rent, and $350 per month for the online advertisement on an adult website.  He noted that the phone number on the website was likely one of Han's numbers.

107.    An investigator advised Longstaff that he had interviewed several individuals who had paid for sex acts at Aroma, in addition to others to whom sexual services were offered but were not received.  Longstaff denied knowledge of these activities.

108.    Longstaff acknowledged that Individual Two, whom he identified in a photograph, was an employee of Aroma and stayed at Aroma seven days a week.

109.    On May 15, 2023, investigators conducted another consensual interview with Longstaff during which Longstaff stated that Aroma Spa had been sold for $10,000 shortly after his prior interview.  He advised that the sale had been made to a Chinese woman known to Han.

110.    He again admitted to making deposits of cash received by Aroma into his KeyBank accounts in amounts less than $10,000 to avoid reporting requirements.

111.    During the execution of the search warrant at the Longstaff/Han Residence, Agents reviewed paperwork showing wire transfers totaling approximately $247,000 sent from Longstaff and Han's KeyBank account ending 3018, and two accounts that Longstaff had failed to disclose during the May 8, 2023 interview, a TD Bank account ending 3438, and a Bank of America account ending 8255.

112.    When confronted about the wires in the May 15, 2023 interview, Longstaff stated that the wires were sent to various members of Han's family located in China.

113.    When asked why he had previously failed to disclose the latter two accounts, Longstaff stated that it was because he was nervous.

114.    Longstaff stated that any amounts prior to 2020 consisted of his money only, while any amounts sent after 2020 contained funds generated from Aroma.

115.    Longstaff admitted that he made cash deposits in amounts less than $10,000 into the previously unknown TD Bank and Bank of America accounts to avoid reporting requirements.

116.    During the interview, the agent informed Longstaff that it was known that the funds generated at Aroma were from payments for sexual services.

15

117.    The agent further advised that he believed that the bulk cash found in the Longstaff/Han Residence was derived from illicit activities.

118.    After the interview had concluded, Longstaff called the agent later that day and the agent answered on speaker phone in the presence of a second agent who listened to the conversation.  As with prior interviews, the call with Longstaff was recorded.

119.    Longstaff stated that he had confronted Han about "extra stuff," meaning sex acts, occurring at the spa.  According to Longstaff, Han did not deny it and stated that he believed it occurred.  Longstaff stated that Han had started to cry when questioned, and had asked him if he wanted a divorce at one point.

120.    Longstaff further stated that Han did not tell him about the money that the agents had seized from the Longstaff/Han Residence, stating that "she was probably getting extra from that," referring to the sexual services performed at Aroma.

<u>Review of Financial Records</u>

121.    Consistent with Longstaff's statements on May 8 and May 15, 2023, records show that Longstaff and Han's personal banking accounts and Longstaff's investment accounts received numerous large cash deposits under $10,000 that appear to be structured to avoid reporting requirements.  Agents also traced the movement of funds containing structured deposits into other accounts, including investment accounts.

122.    After Longstaff's registration of Aroma with the New York State Division of Corporations and State Records in August 2020, banking records dating up until November 2022 show that Longstaff and Han's KeyBank N.A. accounts received consistent cash deposits in amounts between $7,000 and $7,500.

123.    Despite accepting and receiving cash payments from customers, records for Aroma's business account ending in 6078 show that there were no cash deposits made into the account between August 2020 and November 2022.

124.    No other business accounts were identified for Aroma, and multiple customers interviewed by law enforcement confirmed that they had paid in cash.

## **CONCLUSION**

125.    The facts set forth above support a reasonable belief, as required by Supplemental Rule G(2)(f), that the government will be able to meet its burden of proof at trial.

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, the United States of America, respectfully requests that the Court:

(1)    Issue a Warrant of Arrest *in Rem*, in the form submitted with this Complaint;

(2)    Direct any person having any claim to the Defendant Property to file and serve a Verified Claim and Answer as required by 18 U.S.C. § 983(a)(4) and Supplemental Rule G(5)(a) and (b);

(3)    Enter judgment declaring the Defendant Property be forfeited and condemned to the use and benefit of the United States; and

(4)    Award such other and further relief to the United States as it deems proper and just.

Dated: April 22, 2025                                    Respectfully submitted,

                                                        JOHN A. SARCONE III
                                                        United States Attorney


                                        By:     */s/ Elizabeth A. Conger*
                                                Elizabeth A. Conger

17

Assistant United States Attorney
Bar Roll No. 520872

VERIFICATION

STATE OF NEW YORK     )
                                   )   ss:

COUNTY OF SARATOGA    )

Mark Cecilione, being duly sworn, deposes and states:

I am a Special Agent with the Homeland Security Investigations. I have read the foregoing Complaint for Forfeiture and assert that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement officers.

Dated this 22 day of April, 2025.

                                              Mark Cecilione
                                              Special Agent
                                              Homeland Security Investigations

Sworn to and subscribed before me this 22 day of April, 2025.

                                                Notary Public

WILLIAM G. ADAMS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01AD6411487
Qualified in Saratoga County
Commission Expires November 23, 2028

19

**<u>Attachment A</u>**
**Online Advertisement**



**Main Info**

Address: 1602 route 9 Clifton park ny12065 (Behind computer shop)

Major streets: CALL : 516-738-1385

Contact: agajx559959@gmail.com

**City / Category**



Albany, New York Massage Parlors    Current location

**Portfolio**

Last Seen: an hour ago    Favorited by: 0

Profile Views: 47,546

## Description

♥ ♥ ▬NEW SEXY GIRLS ARRIVED ♥ ♥ ♥Don't Miss IT !▬♥ ♥

30minutes,$45.

60minutes.$60.

Tel:516-738-1385

9.00am-9.30pm  (Open 7 Days)

★—Come see us.
★—Young & Hot Beautiful Asian Girls
★—Don't Miss，Let you enjoy different treatments and feelings
★—New Management , New Feeling，New Girls
★—Appointment priority!
★—Here is a place where you will be freated good and friendly
★—And you will relieve your exhaustion.
★—Please experience it by all means today.
★—You will definitely want to come back.

### Short Reviews (0)

Write a short review

### Reviews (0)

no reviews

### From Forums

? Share your question or comment about this ad

- 🏆 Write a new review and get a complimentary VIP access for 2 weeks
- 🏆 Write a short review and get a complimentary VIP access for 4 days
- ⚠ Pay attention to advertisers requesting you to pay in advance through gift cards or other means. We do not recommend it and advise you to treat such situations with care.